# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | | |
|---|---|---|
| **BRITE SMART CORP.** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civ. Action No. 2:14-cv-760-JRG-RSP |
| | § | |
| **GOOGLE INC.** | § | **JURY DEMANDED** |
| | § | |
| *Defendant*. | § | |
| | § | |

## PLAINTIFF BRITE SMART CORP.'S REPLY CLAIM CONSTRUCTION BRIEF

**TABLE OF CONTENTS**

I. INTRODUCTION & ANALYSIS ............................................................................... 1
    A. "Client" ................................................................................................................. 1
    B. "Cookie" ............................................................................................................... 2
    C. "Fraud"; "Fraudulent"; "Fraudulent Activity"; "Invalid Click" ........................... 2
    D. "Pay-Per-Click Engine"; "Pay-Per-Click System" .............................................. 4
    E. "Requested Link" ................................................................................................. 4
    F. "Search Engine" ................................................................................................... 5
    G. "User" .................................................................................................................. 5
    H. "in an order according to incremental compensation for click-through to the websites" ... 5
    I. "clicks on one of the merchant websites" [See "requested link" above] ............ 6
    J. "client side" and "server side" [See "client" above] ........................................... 6
    K. "code identifying … end user's computer" ........................................................ 6
    L. "code uniquely identifying … end user's computer" .......................................... 6
    M. "concatenating…" ............................................................................................... 7
    N. "determining whether the requested link …" ..................................................... 7
    O. "examining a duration between/of two visits …" ............................................... 7
    P. "information about one or more selections/clicks …" ........................................ 7
    Q. "links associated with [] web pages [and websites]" .......................................... 8
    R. "predetermined number of requests" ................................................................... 8
    S. "receiving [] a [search] request …" .................................................................... 8
    T. "web pages" and "websites" ................................................................................ 8
II. THE PREAMBLE OF CLAIM 1 OF THE '057 PATENT ........................................ 9
III. GOOGLE'S ANTECEDENT BASIS "INDEFINITENESS" ARGUMENTS ............ 9
    A. "website information" as used in the last limitation of '667: 1, 18; '763: 1, 14 ... 9
    B. "the requested link" as recited in '104:1 ............................................................ 10
IV. ORDERING OF STEPS OF THE METHOD CLAIMS ........................................... 10

## TABLE OF AUTHORITIES

**Cases**

*Advanced Software Design Corp. v. Fiserv, Inc.*, 641 F.3d 1368 (Fed. Cir. 2011) ........................ 7

*Bose Corp. v. JBL, Inc.*, 274 F.3d 1354 (Fed. Cir. 2001) ........................................................... 6, 9

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294 (Fed. Cir. 2003) ........................ 4

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374 (Fed. Cir. 2006) ...................... 3

*Energizer Holdings v. Int'l Trade Comm'n*, 435 F. 3d 1366 (Fed. Cir. 2006) .............................. 10

*Hormone Research Found. v. Genentech, Inc.*, 904 F.2d 1558 (Fed. Cir. 1990) ........................... 3

*In re: Hulu Privacy Litigation*, No. C11-03764 (N.D. Cal. June 16, 2014) ................................ 10

*Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323 (Fed. Cir. 2001) ......................... 10

*KSR Intern. Co. v. Teleflex Inc.*, 127 S. Ct. 1727 (2007) ............................................................... 8

*Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348 (Fed. Cir. 2003) .................................... 9

*Playtex Products, Inc. v. Procter & Gamble Co.*, 400 F.3d 901 (Fed. Cir. 2005) ......................... 8

*Slimfold Manufacturing Co. v. Kinkead Industries, Inc.*, 810 F.2d 1113 (Fed.Cir.1987) ............ 10

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339 (Fed. Cir. 2009) ............ 9

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322 (Fed. Cir. 2006) ............ 1

I.  INTRODUCTION & ANALYSIS

Brite Smart cites to Google products in its brief to provide probative evidence that a skilled artisan would have ascribed particular meaning to certain claim terms at a given point in time. Brite Smart's citations to Google products are not used to foreclose the question of whether an accused system lies within any disputed scope. The rule "does not forbid any glimpse of the accused product or process during or before claim construction." *See Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1331 (Fed. Cir. 2006). While design documents and testimony of skilled artisans may provide probative evidence regarding how a skilled artisan would have understood certain terms at the time of the invention, claims are not to be construed in light of an accused system. For example, the way in which certain Google design documents have used the word "concatenation" is not introduced to tailor the claim construction to "fit the dimensions of the accused product or process." Opening Br. at 21, n.8.

A.  "Client"

Google's arguments provide support for Brite Smart's position that "client" is any entity that requests information or services from a server. Substituting Google's proposed construction of "computer" for "client" leads to nonsensical results. *See* Resp. at 17. For example, the first limitation of '667:14 would read "generating a code on the server side, the code identifying a device on a [computer] side". Moreover, Google's own extrinsic source refers to "the client's computer," which, using Google's proposal, would translate to "the [computer's] computer." Resp. Ex. 3 (defining "cookie" as "an Internet mechanism that lets site developers place information on the client's (i.e. your) computer for later use.") In addition, Google also argues that a client may be a "process". Resp. at 3. Google's extrinsic evidence also states that a client may be "an application program". Resp. Ex. 12 at 5. Thus, the construction of "client" should not be limited to a computer.

B. "Cookie"

Google's extrinsic evidence supports Brite Smart's construction that a cookie is a small file stored on a computer containing a code used to identify a user, a browser, or a computer. *See* Resp. Ex. 11, RFC 2109 §7.1 at p. 16 (discussing use of a cookie to "track the path of a user through the server") and §6.1 at pp. 14-15 (discussing the use of *server-side* resources to store cookie information). Thus, "cookie" should not be construed to require that it can only be stored on a client-side computer (or "browser computer"). Moreover, Google cites no evidence to support its contention that a "cookie" must necessarily be stored on a "browser computer." Google also does not dispute that its proposal would be unhelpful to a jury.

C. "Fraud"; "Fraudulent"; "Fraudulent Activity"; "Invalid Click"

Google posits that the Court should look to general-purpose dictionaries for its definition of the "fraud" terms. Not so. That is not what a skilled artisan in the field of click-fraud detection would understand, as proven by the many definitions of click-fraud used by skilled artisans cited by Brite Smart. *See* Opening Br. at 5-9. Brite Smart cited exhaustively to the relevant field of art. That Brite Smart's references were authored somewhat after the invention's filing date does not negate the fact that the references provide probative evidence of the meaning of the terms as of the filing date. *See id.* Indeed, click-fraud was a relatively new phenomenon at the time of the invention. *See* Opening Br. Ex. 15, p. 32.

Google's argument that the patentee "agreed" that "fraud" required the same "intent" as that suggested by the plain and ordinary meaning is undercut by observing that Google took an extract from the patentee's response to an office action out of context instead of citing the complete response. *See* Resp. at 14. The "over-clicking" described in the office action and the specification is described in the response as merely *one example* of fraudulent activity. *See* Opening Br. Ex. 17, '057 File History, 9/27/13 Amendment at 9.

2

Google argues that there are *other* possible categories for clicks other than "legitimate" or "fraudulent." Resp. at 16. Google's argument further *bolsters* Brite Smart's position. For example, where claim 1 of the '104 patent recites a determination of whether a click is "legitimate or fraudulent," using Google's argument, the step could determine that the click was "not legitimate" and also "not fraudulent." Or the step could make a determination that the click was "not legitimate" but was unable to make a determination as to whether the click was or was not also "fraudulent." Per Google's example, the click could be determined to be accidental, e.g., not fraudulent *and* not legitimate. *See* Resp. at 13. Applying Google's argument, the claim need not make a determination as to both "legitimate" and "fraudulent." Google's position suggests that some thresholds of questionable clicking activity, perhaps two or three clicks, may be flagged as accidental while ten thousand clicks may be determined doubtlessly fraudulent.

Tellingly, Google provides no explanation regarding its own click-fraud patent and its references to fraudulent activity. *See* Opening Br. at 8-9 and Ex. 16. Google thereby does not attempt to exclude the evidence by alleging that the accused system practices the patent.

Because Google has not offered a proposed construction for the "fraud" terms, Brite Smart's proposals should be adopted.

As for "invalid clicks," Google appears to concede that the term began appearing around 2006. *See* Opening Br. at 8; Resp. at 17. It's possible that the term "invalid clicks" was more acceptable to advertisers. Google's argument that different claim terms require different meanings is unavailing. *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380-81 (Fed. Cir. 2006) (recognizing that "[c]laim drafters can also use different terms to define the exact same subject matter."); *Hormone Research Found. v. Genentech, Inc.*, 904 F.2d 1558, 1567 n.15 (Fed. Cir. 1990) ("It is not unusual that separate claims may define the invention using

3

different terminology, especially where (as here) independent claims are involved."). Finally, Brite Smart's evidence that "clicks" include software-generated clicks is not objectionable because the evidence is independent of any accused system, which only involves the *destination* of the clicks – not their *source*. *See* Resp. at 18.

### D. "Pay-Per-Click Engine"; "Pay-Per-Click System"

Providing no evidence, Google alleges that the patentee "explicitly redefined" the term "pay-per-click search engines." Resp. at 7. He did not. Moreover, Google failed to refute that even if an embodiment of the invention teaches a specific pay-per-click ordering, it does not mean that the claim is limited as well. *See Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1301 (Fed. Cir. 2003) ("[T]he fact that the inventor anticipated that the invention may be used in a particular manner does not limit the scope to that narrow context.")

Google incorrectly asserts that Brite Smart did not provide "proper" evidence as to the meaning of the term. Resp. at 7-8. Crucially, the Tuzhilin Report provides a definition of Cost-per-Click or Pay-per-Click advertising separate and apart from any description of the accused Google system. *See* Opening Br. Ex. 15 at 7.

### E. "Requested Link"

Google proposes, in part, that a "requested link" is "a clicked on *item* on a web page." Resp. at 19. Google does not deny that the "item" that gets clicked on is a pay-per-click *advertisement*. *See id*. As to whether the "requested link" is "the clicked on advertisement" (Google) or "the click on the advertisement" (Brite Smart), the claimed determination undeniably involves "clicks" together with the time between clicks and the frequency of clicks, etc. *See* Resp. at 20. Only Brite Smart's construction makes sense in the context of the claims of the '104 patent where the term appears. *See* Opening Br. at 11.

4

Google's extrinsic evidence indicates that the selection of a link <u>transfers</u> the user to another web page. Resp. at 20 (emphasis added). Using Google's definition, the selection of a link may be considered a "request." Thus, one other reasonable construction, though not Brite Smart's first choice, is that a "requested link" is a "requested transfer" to another page. For example, a user clicks on an advertisement of interest to <u>request</u> a <u>transfer</u> to the advertiser's website. Here, the "requested transfer" is signaled by the "click on the advertisement [or link]".

### F. "Search Engine"

Google does not dispute the plain meaning of "search engine." *See* Resp. at 10-11. Instead, Google improperly imports limitations from the specification. *See id*; *see also* "pay-per-click engine" above at § I.D (p. 4) (explaining why pay-per-click engine is not limiting).

### G. "User"

Google provides no reasons why a "user" cannot include a software process (i.e., a robot or "bot") running on a computer. *See* Resp. at 1-2. The Tuzhulin Report discusses how "bots" may be the source of incoming clicks, and does so generally – not in the context of Google's systems. *See* Opening Br. Ex. 15, Tuzhilin Report, p. 15. Moreover, any embodiments described in the specification involving a human user should not be read into the claim language.

### H. "in an order according to incremental compensation for click-through to the websites"

Google misstates the phrase that Brite Smart is asking the Court to construe. *Compare* Resp. at 8 with Dkt. 75-1 at 21. The Court should decline to construe the *entire* preamble if only a *portion* of the preamble meets the *Catalina Marketing* criteria. *See* Opening Br. at 13-14. Google does not deny that a *portion* of the preamble is not limiting if it does not meet the *Catalina Marketing* criteria, which it does not. *Compare* Resp. at 8 with Opening Br. at 13-14. Moreover, even if the Court considers the *entire* preamble, the scope of the claim is "reasonably

5

ascertainable by those skilled in the art" without reading the preamble phrase as a claimed limitation. *See Bose Corp. v. JBL, Inc.*, 274 F.3d 1354, 1359 (Fed. Cir. 2001).

### I. "clicks on one of the merchant websites" [See "requested link" above]

Google's argues that a skilled artisan would interpret "click on one of the merchant websites" to literally mean in the context of the claim "a click on the advertiser's website." *See* Resp. at 18-19. Google's sole support is speculation that a user need not leave the search engine website to visit an advertiser's website because the advertiser's website "may appear in a new window or in a different frame that the search engine. *Id.* at 19. Google provides no evidence for its far-afield proposition: nothing in the intrinsic record and nothing that could be relied upon by the skilled artisan. *See id.* Contrastingly, Brite Smart has shown that its proposal is supported by the intrinsic record, the Tuzhilin Report (outside of the context of Google's systems), and the patentee's consistent manner of use of the phrase within the claim. Opening Br. at 15-16.

### J. "client side" and "server side" [See "client" above]

Google fails to explain why construing "client" to include a client-side software process would cause the phrases "client side" or "server side" to be indefinite. *See* Resp. at 2-4. If the Court agrees that "client" can include a client-side software process, then the parties appear to agree that no constructions for these terms are required. *See* Resp. at 4; Opening Br. at 17.

### K. "code identifying … end user's computer"

Google fails to differentiate this term "code identifying" from the term "code *uniquely* identifying." Resp. at 4-6. Instead, Google incorrectly argues that the "code" in this term must uniquely identify a device. *See id.* The "code uniquely identifying" term (below) addresses that.

### L. "code <u>uniquely</u> identifying … end user's computer"

Google incorrectly argues that the word "uniquely" modifies the "code" such that the "code" must be unique. Resp. at 6. As a matter of semantic construction, the word "uniquely"

6

qualifies "identifying" such that the identification must be the only identification intended by the "code", i.e., that a given code only correspond to a single device.

### M.   "concatenating…"

The case cited by Google, *Advanced Software Design Corp. v. Fiserv, Inc.*, did not consider the construction of "concatenating."  Resp. at 21 citing 641 F.3d 1368, 1377 (Fed. Cir. 2011).  Instead, the Federal Circuit merely used the word in connection with a procedure where an embodiment placed information end-to-end.  While "concatenation" *includes* placing information end-to-end, it is not limited to it.  For example, if A, B, and C are concatenated, then "A" has been concatenated with "C" even though "B" is between them.  Moreover, Google does not dispute that Judge Love found that the "*common use*", i.e., plain meaning, of "concatenate" "does not preclude intervening bit fields."  *Compare* Resp. at 22 with Opening Br. at 21.

### N.   "determining whether the requested link …"

Google argues that it is unclear which "code" is referenced in the last limitations of claims 1 and 9 of the '104 patent.  Resp. at 27.  A skilled artisan would understand that a previous step calls for the concatenation of two codes (possibly along with other information), after which, there will exist a larger code that subsumes the two previously-referenced codes (and possibly other codes or information), which larger code is then used in subsequent steps.

### O.   "examining a duration between/of two visits …"

Google misapprehends that an examination regarding a time interval may be performed by comparing the time interval to a threshold value.  Resp. at 11-12.  While other ways to do it exist, nothing in the claim suggests that it must be performed in the manner described by Google.

### P.   "information about one or more selections/clicks …"

Google argues that a skilled artisan would not understand the "information" term because it wasn't explicitly defined in the specification.  But "a person of ordinary skill is also a person

7

of ordinary creativity, not an automaton." *KSR Intern. Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 1742 (2007). Google also mistakenly believes that Brite Smart read "website information regarding" out of the claims. Resp. at 25. Not so. Brite Smart argued that a skilled artisan would understand that the "website information regarding [the website]" would be used to *identify* the website. Opening Br. at 24.

    Q.    **"links associated with [] web pages [and websites]"**

Google attempts to create a new restriction that the links *must* lead directly to an advertiser's website, suggesting, in effect, "where else would they go?" Google rejects the extrinsic evidence detailing that redirects are used, and also the skilled artisan's common sense: in a pay-per-click system, the pay-per-click provider requires notification so that the charge for the click can be recorded, before being sent to the advertiser's webpage. Per the specification, "[t]his allows the pay-per-click company 120 to invoice the website." *See* '104 patent 2:41-42.

    R.    **"predetermined number of requests"**

Google asks [h]ow far in advance must the predetermined number be arranged?" Resp. at 23. Google conflates a lack of precision with a lack of construability. Unless the specification imposes a precise construction, a term of degree shouldn't be interpreted with a strict limitation. *See Playtex Products, Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 907 (Fed. Cir. 2005).

    S.    **"receiving [] a [search] request …"**

Google alleged that these phrases were indefinite, requiring Brite Smart to brief them, but Google then failed to address them in its brief. *See* Dkt. 75-2 at 9.

    T.    **"web pages" and "websites"**

As for "web pages," Google provides no reasons why its proposed construction – containing the word "hypertext" – would be helpful to the jury. Resp. at 28-29. It will only create confusion as to the meaning of "hypertext document." As for "websites," Google does not

8

dispute that the addition of the word "server" in the context of "clicking on *websites*" will create jury confusion. *Compare* Resp. 28-29 with Opening Br. at 28. Moreover, Google's proposals, taken together, do not make sense: if a "web page" is a hypertext document and a "website" is a collection of "web pages," then how can a "website" also be a "server"? *See* Resp. at 28.

## II.     THE PREAMBLE OF CLAIM 1 OF THE '057 PATENT

The scope of the claim is "reasonably ascertainable by those skilled in the art" without reading this preamble phrase as a claimed limitation. *Bose Corp. v. JBL, Inc.*, 274 F.3d 1354, 1359 (Fed. Cir. 2001). Thus, the plain language of the claim does not require reading this preamble phrase as a required limitation.

## III.    GOOGLE'S ANTECEDENT BASIS "INDEFINITENESS" ARGUMENTS

Google alleges that Brite Smart has "dropped" its antecedent basis argument. Resp. at 29 n.31. It has not. The Joint Claim Construction Statement reflects Brite Smart's position: none of the antecedent basis terms need construction. Dkt. 75-1, pp. 25-26.

### A.     "website information" as used in the last limitation of '667: 1, 18; '763: 1, 14

Google also alleges that the phrase "website information" also indefinite because it is not preceded by a definite article. Resp. at 29. This typographical error is easily corrected by prepending "the" or "said" to the phrase. It is within a district court's power to "correct obvious minor typographical and clerical errors in patents." *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003). A district court may correct an error in a patent if "(1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1353 (Fed. Cir. 2009) (citing *Novo Indus. L.P.*, 350 F.3d at 1357). Here, the criteria are met, e.g., the last limitation of claim 1 of the '667 patent states: "receiving <u>said</u> code and <u>said</u> website information

9

at the server side, and detecting fraudulent activity by measuring the duration between clicks by said client to said selected website by examining <u>said</u> code and website information." Thus, (1) the second "said" is missing; (2) the error is apparent from the face of the patent; and (3) is not contradicted by the prosecution history.

### B. "the requested link" as recited in '104:1

Google does not dispute that an antecedent basis can be present by implication. *See* Resp. at 30; *see also Energizer Holdings v. Int'l Trade Comm'n*, 435 F. 3d 1366, 1371-72 (Fed. Cir. 2006). Moreover, this phrase is further addressed at § I.E (p. 4) above.

### IV. ORDERING OF STEPS OF THE METHOD CLAIMS

Google does not dispute that the Court need not decide the ordering of the method claims as part of claim construction. *See* Resp. at 30; *see also Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1342 (Fed. Cir. 2001). Contrary to Google's footnote, Brite Smart opposes the ordering of the method steps. *Compare* Resp. at 30 n.32 with Dkt. 75-1, pp. 26-28.

Google does not dispute that cookies or codes are assigned to identify a client when the client first makes contact with the server. *See* Resp. at 30. Such cookie functionality is the norm. *See In re: Hulu Privacy Litigation*, No. C11-03764 at *13 (N.D. Cal. June 16, 2014) ("Whenever a computer user's web browser requests any part of a web page, the cookies associated with the domain for that web server are sent to the web server with the request for the web page.") Thus, Google's arguments that a server needs to wait until the client issues a search request are without merit. In addition, Google's argument that the "code" is generated after obtaining a search request is *not* supported by the specification. Even if it were, such ordering is not properly read into the claims. The specification discloses the "periodic" generation of a code. *See, e.g.*, '104 patent 1:52-54. Thus, the code may be assigned at any time.

10

Dated: June 9, 2015

Respectfully submitted,

/s/*Robert D. Katz*
Robert D. Katz
Lead Counsel
Texas Bar No. 24057936
**KATZ PLLC**
6060 N. Central Expressway, Suite 560
Dallas, TX 75206
(214) 865-8000
rkatz@katzlawpllc.com

Stafford Davis
Texas Bar No. 24054605
**THE STAFFORD DAVIS FIRM, PC**
305 South Broadway
Suite 406
Tyler, TX 75702
(903) 593-7000
sdavis@stafforddavisfirm.com

**ATTORNEYS FOR PLAINTIFF
BRITE SMART CORP.**

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a) on the date above. Any other counsel of record will be served by electronic mail.

/s/ *Robert D. Katz*
Robert D. Katz